# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**13-844**


**RUSSELL MEISSNER**

**VERSUS**

**MILLARD BRADFORD**


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. C-2012-0909, DIVISION A
HONORABLE MARTHA ANN O'NEAL, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**MARC T. AMY
JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Marc T. Amy, Billy Howard Ezell, and John E. Conery, Judges.


**AFFIRMED.**

**Mitchel M. Evans, II**
**416 North Pine Street**
**DeRidder, LA   70634**
**(337) 462-5225**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Russell Meissner**

**Millard Bradford**
**Palmetto Creek Apartments**
**150 Ellis Road, Apartment C4**
**DeRidder, LA   70634**
**DEFENDANT/APPELLEE:**
**IN PROPER PERSON**

**AMY, Judge.**

The plaintiff alleged that he and the defendant became involved in a controversy surrounding the eligibility of two prospective coaches while serving in leadership positions in a community youth football league. He asserted that, during that controversy, the defendant stated to others that the plaintiff had "problems with people of color." The plaintiff filed this action in defamation and alleged that he sustained damages as a result of the statement. The trial court found in favor of the defendant. The plaintiff appeals.

### Factual and Procedural Background

In 2012, when this matter arose, Russell Meissner served as the President of the DeRidder Youth Football League. While serving in that capacity, Mr. Meissner was informed that two prospective coaches possibly had criminal backgrounds. Mr. Meissner explained that, although the prospective coaches denied criminal convictions on their applications, he later confirmed the criminal backgrounds through an inquiry with the Sheriff's office. Mr. Meissner stated that, in August 2012, he brought the convictions to the attention of the League's Board and that, ultimately, the Board determined that one of the prospective coaches would not be permitted to coach. The Board determined that the other prospective coach would be allowed to participate in a limited fashion.

Mr. Meissner explained, however, that during ensuing discussions, Millard Bradford, a Commissioner with the League, objected to the action regarding the prospective coaches. Mr. Meissner stated that, during what was described as an "emergency meeting" on the subject in early September 2012, Mr. Bradford expressed that, if the Board maintained its position, it "would be having legal trouble and the NAACP would probably be getting involved." According to Mr.

Meissner, he became frustrated with what he considered to be the Board members' actions "behind [his] back" and that he told the attendees that he "quit." Mr. Meissner explained that Mr. Bradford stated: "'Oh good, okay[.]'" Mr. Meissner confirmed his resignation stating that "'yeah, I'm done with it, I've had enough'."

After Mr. Meissner's departure, the gathering of approximately forty to fifty attendees, as estimated by one witness, continued. Brandie Lampin, a League Commissioner and a coach, explained that she recorded the ensuing discussion. She stated that, during that gathering, Mr. Bradford stated that: "[H]e thinks [Mr. Meissner] has a problem with people of color." Ms. Lampin denied that anyone else "endorsed" Mr. Bradford's statement, but that Mr. Bradford made the statement "a few times."

Subsequently, after his resignation as President, Mr. Meissner continued in his coaching position with a team in the League. The following week, however, during a team practice session, Mr. Meissner was approached by Mr. Bradford and the new President of the League. The men were joined by two uniformed officers in attendance at the practice. During the resulting discussion, Mr. Meissner was informed that he had been suspended and would no longer be allowed to coach.

Mr. Meissner explained that while attending a few games after the above incident, he "had several people bump into [him]" and tell him to "watch [his] back and so forth" "because [he] was racist basically." Mr. Meissner identified the individuals as "African American males" and that they said that they knew where he lived and that he should "watch [his] back." Mr. Meissner explained that the incident affected his health, reflected by what he described as increased depression, headaches, and sleep disturbances. Mr. Meissner also reported employment difficulties, noting that he missed work at times due to depression and that

"everywhere [he] went people had actually heard of this occurrence." Mr. Meissner also explained that because of what he perceived to be threats, he and his fiancée had moved to another community and that, although he and his fiancée were still engaged, their previous plan to marry was "on hold for now."

Citing these damages, Mr. Meissner filed the present matter in October 2012, naming Mr. Bradford as the defendant.[1] Mr. Meissner alleged in the petition that Mr. Bradford's "multiple verbal publications to third parties that Petitioner has problems with men of color were intentionally false and defamatory *per se*, in that [Mr. Bradford] alleged that Petitioner was essentially a racist[.]" The petition further stated that such "a moniker" "would inherently tend to harm the reputation of another so as to lower the person in the estimation in the community, and/or to deter others from association or dealing with the person, or otherwise expose a person to contempt or ridicule." Mr. Meissner denied the accuracy of the subject statement(s) and alleged that they were communicated "with a high degree of awareness of probably falsity; and, were specifically intended to cause Petitioner injury."

Following a bench trial, the trial court denied the plaintiff's claim. In extensive written reasons, the trial court explained that Mr. Meissner became upset after being informed by Mr. Bradford of what Mr. Bradford felt was a further corrective action needed with regard to the two prospective coaches. After resigning and leaving the field, "several individuals approached Millard Bradford, as they had found out how upset Russell Meissner was. There became a very

---

[1] Although the League's insurer was initially named as a defendant as well, the insurer was not served and was dismissed.

3

heated and loud conversation, and this is what was recorded on the microcassette recorder." The trial court further found that:

> Mr. Bradford's voice is very clear, and the Court can identify him. He does say twice that petitioner "has problems with people of color." However, I will also point out that there is another individual . . . that is very irate and very upset, more so than anyone else on the recording. The Court can only imagine what was happening at the field, as listening to the microcassette recorder, it is clear that all parties were yelling at each other in a very heated and hot conversation without any of them fully knowing any of the facts for which they were complaining to each other."

> From the testimony received, it is clear that Russell Meissner believed that Millard Bradford took the whole matter to the NAACP instead of the NAACP calling Mr. Bradford, and Mr. Bradford telling them that it could be handled without their involvement. Mr. Meissner testified that he quit because he didn't want to be involved with the NAACP. Mr. Meissner jumped to a conclusion of something that did not occur.

> Moreover, Mr. Bradford's language, while rude, heated, and clearly during a heated conversation with other rude, unruly individuals, was inappropriate as it applied to Mr. Meissner.

In light of those factual findings, the trial court ultimately determined that:

> [C]learly, in the context of the statements made, the remarks were nothing more than opinions and hyperbole as stated by a very irate Millard Bradford, who was being verbally attacked by at least two and possibly three other people. This is supported by the testimony [of another attendee to the incident]. Mr. Meissner's feelings were hurt, and he believed that he was somehow "wronged" by the defendant due to Bradford's cruel statement. This, however, is not sufficient to support petitioner's claim for damages due to defamation.

In alternative factual findings, the trial court determined that "[e]ven in the event that somehow a reasonable person could find that these statements were not opinion, there is no proof of any damages."

Mr. Meissner appeals.

4

**Discussion**

In his brief to this court, Mr. Meissner challenges the trial court's determination that the subject statements were mere hyperbole or opinion. Rather, Mr. Meissner argues that, even if ostensibly within the form of an opinion, that opinion in this instance implied a statement of fact which cannot be protected by a claimed privilege. Mr. Meissner argued that the statement, given its nature and his claimed damages, should be viewed as defamatory per se.

As explained in *Fitzgerald v. Tucker*, 98-2313, p. 10 (La. 6/29/99), 737 So.2d 706, 715, defamation is a tort arising out of La.Civ.Code art. 2315 and one that "involves the invasion of a person's interest in his or her reputation and good name." A plaintiff seeking to recover under a defamation cause of action must prove: (1) the existence of a false and defamatory statement concerning another; (2) unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury. *Cyprien v. Board of Sup., ex rel. Univ. of LA Sys.*, 08-1067 (La. 1/21/09), 5 So.3d 862 (quoting *Costello v. Hardy*, 03-1146 (La. 1/21/04), 864 So.2d 129). The element of fault, is often characterized as malice, actual or implied, in the jurisprudence. *Id.* Thus, in restating the plaintiff's burden, the supreme court remarked that a plaintiff must prove that the defendant, with actual malice or other fault, published a false statement with defamatory words, causing damages to the plaintiff. *Id.* (quoting *Trentecosta v. Beck*, 96-2388 (La. 10/21/97), 703 So.2d 552).

Notably, and relevant to our review of the trial court's ruling in this case, the supreme court has explained that:

> A pure statement of opinion, which is based totally on the speaker's subjective view and which does not expressly state or imply the existence of underlying facts, usually will not be actionable in

5

defamation. That is because falsity is an indispensable element of any defamation claim, . . . and a purely subjective statement can be neither true nor false.

*Bussie v. Lowenthal,* 535 So.2d 378, 381 (La.1988). "The question of whether a statement is one of fact or opinion depends upon the circumstances in which the statement was made, and the reasonable inferences which may be drawn from a statement of opinion will vary depending upon the circumstances of the case." *Fitzgerald*, 737 So.2d at 718.

In this case, and as set forth above, the trial court determined that Mr. Bradford's statement(s) were those of opinion and were in the nature of hyperbole given the context of the surrounding circumstances. The record supports that determination. It is clear from the record that the League leadership and the larger League community became entangled in the controversy surrounding the criminal backgrounds of the two prospective coaches. That is evidenced by the multi-week chain of events, the seeming awareness of the controversy by numerous League community members beyond the League's leadership, and the apparent outreach to the NAACP. Additionally, the trial court remarked upon the generally hostile nature of the participants' conduct at the meeting at which Mr. Bradford's statements were made.

In representing himself at trial, Mr. Bradford specifically explained that he has "a great deal of respect for" Mr. Meissner and that he "never viewed [him] as a racist of any kind." He denied that he had "said that he was a racist" or that he had "insinuated that he was a racist." Mr. Bradford described himself as a "man of peace," "not a man of confusion." He further stated that he initially reached out to Mr. Meissner because he did not want to have an issue of race that had been raised by one of the prospective coaches and that, upon attending a meeting with the

6

NAACP, had assured the group that he had no "problem with trying to resolve this issue because we do not need an issue of race" in the community.

However, in describing the incident at which the subject statement came about, Mr. Bradford explained that when he approached Mr. Meissner at the practice field, Mr. Meissner "just blew up[,]" and began cursing and walked off. Mr. Bradford stated that Mr. Meissner "accused [him] of contact[ing] the NAACP[.]" Mr. Bradford explained that he had not done so and that he told Mr. Meissner that he owed him an apology. Mr. Bradford explained that, when Mr. Meissner would not return, the remainder of the group continued "talking about the issue, trying to resolve it[.]" Because he felt that members of the gathering, who were not on the League Board should leave the scene, he asked them to leave. Instead, however, one of the attendees began cursing and "making threats that he was gonna do bodily harm to [him]." Mr. Bradford admitted that, when these individuals "approached," he "told them that Mr. Meis[s]ner has a problem with people of color." Mr. Bradford then stated that "in that statement I said I apologize, once again I say he has problem with people of color[.]" In explaining his statement at trial, he stated that "the reason being why I say that on three different occasions to where me and Mr. Meis[s]ner have conversations that and what I mean by that - - that he has a problem with anybody that shows authority - - authoritation [sic] to him, that disagrees with him on anything, whether they are black, white, green or purple."

With this background in mind, the record evidences that the statements were obviously opinion in nature. Those in attendance at the gathering were well aware of, if not involved, in the underlying course of events which included at least some element of tension related to race at its core. The trial court was not required to

determine that the statements, made within the context of the gathering, led those League members in attendance to feel that there were unknown, underlying facts portraying Mr. Meissner in a more unfavorable, defamatory light. Rather, the trial court permissibly viewed the incident merely as a publication of the speaker's opinion during the course of a heated exchange.

As the record supports the trial court's determination, we find that Mr. Meissner's argument on appeal lacks merit.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this proceeding are assessed to the plaintiff-appellant, Russell Meissner.

**AFFIRMED.**